Byron Cooper (State Bar No. 166578)
530 Lytton Avenue, Suite 200
Palo Alto, California  94301
Telephone: (650) 283-4244
Facsimile: (650) 617-3201
Email: bcooper@teklaw.co

Attorneys for Plaintiff
MEDIOSTREAM, INC.

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| MEDIOSTREAM, INC., | Case No. 10-CV-05979 EJD |
| Plaintiff, | **MedioStream's Opposition to MPEG LA's Motion To Dismiss and Request Filing Of Amended Complaint.** |
| v. | |
| MPEG.LA, L.L.C., SONY CORPORATION, and SONY CORPORATION OF AMERICA | **Judge: Honorable Edward J. Davila Date: September 16, 2011 Time: 9:00 a.m. Courtroom: 1** |
| Defendants. | |

## INTRODUCTION

Plaintiff MEDIOSTREAM, INC. opposes defendant MPEG LA, L.L.C.'s ("MPEG LA")

motion to dismiss, and respectfully requests that this Court enter an order filing MedioStream's

Amended Complaint, which is attached hereto as Exhibit 1.  MedioStream informed MPEG LA's

counsel during a phone conference on August 15, 2011 that MedioStream proposed amending its

complaint in this matter making MPEG LA's motion to dismiss moot.  MedioStream heard nothing

from MPEG LA until today, August 29, 2011 even though MedioStream filed its amended complaint

ten (10) days ago on August 19, 2011.  MPEG LA's counsel waited until after MedioStream's

opposition was due before providing a copy of an alleged letter dated August 16, 20111 wherein

MPEG LA claimed for the first time that it opposed the filing of MedioStream's Amended Complaint.

1   In addition to MedioStream's confirmation e-mail sent after the parties spoke on Monday, August 15,

2   2011, MedioStream served a copy of the Amended Complaint on MPEG LA and filed the same via

3   the Court's e-filing system on August 19, 2011.  MedioStream has heard nothing from MPEG LA

4   since filing and serving its Amended Complaint.

5          Despite clear notice that MedioStream would file the Amended Complaint believing the

6   motion to dismiss would be rendered moot based on the parties' discussions, MPEG LA did not object

7   to the filing of the Amended Complaint until ten days after it was filed, when MPEG LA's counsel

8   contacted MedioStream's lawyers to inform MedioStream that MPEG LA would object to the filing,

9   and that the motion was not therefore moot and MedioStream had missed its filing date for its

10  opposition.  MedioStream immediately informed MPEG LA's counsel that this Court would not

11  tolerate wasting the court's time with this kind of litigation gamesmanship.

12         MedioStream respectfully requests that this Court deny MPEG LA's motion as moot, and enter

13  an order filing MedioStream's Amended Complaint as of August 19, 2011because Rule 15, Federal

14  Rules of Civil Procedure and the overwhelming weight of authority liberally grant plaintiff's leave to

15  amend a pleading, especially where, as here, the case is in its infancy.  MedioStream also requests that

16  MPEG LA's counsel be made to pay the costs of requiring this Court to hear its moot motion, as well

17  as MedioStream's motion to extend time, resulting from MPEG LA's unprofessional litigation tactics.

18                                  **SUMMARY OF FACTS**

19         MedioStream filed its original Complaint for Declaratory Relief and Breach of Contract

20  ("Complaint") on December 30, 2010. MedioStream alleges that MPEG LA is the "Licensing

21  Administrator" for numerous "Licensors" that own and have rights to license one or more patents

22  necessary for compliance with the MPEG-2 Standard (referred to as "MPEG -2 Essential Patents").

23  (Complaint ¶ 13.)  MPPG LA filed its motion to dismiss the complaint alleging diversity jurisdiction

24  was not sufficient grounds for federal jurisdiction, based on an identical motion MPEG LA filed in the

25  Central District of California.  *See Nero AG v. MPEG LA, L.L.C.,* Case No. 2:10-cv-03672-MRP (CD

26  CA).  The only issue MPEG LA identified for the Court to resolve in its Local Rule 7.4 Statement Of

27  Issues was "[h]as MedioStream met its burden of demonstrating that this Court has jurisdiction,

28  pursuant to either 28 U.S.C. § 1332 or the Federal Declaratory Judgment Act, over the present

1   action?"  This case has been delayed due to several reassignments, and MedioStream has stipulated to

2   each request by MPEG LA to extend deadlines.  When MPEG LA's counsel contacted MedioStream

3   in early August regarding the case, MedioStream indicated that it would have a response to the motion

4   and the parties set up a phone conference to discuss the case on August 15, 2011.  Thereafter

5   MedioStream filed and served an Amended Complaint for declaratory judgment of non-infringement,

6   invalidity, and unenforceability of U.S. Patent numbers Re 37,222; 5,191,436; 5,291,486; 5,298,991;

7   5,343,248; 5,428,396; 5,461,420; 5,481,553; 5,510,840; 5,539,466; 5,543,847; 5,559,557; 5,663,763;

8   5,666,461; 5,701,164; 5,946,042; 5,982,437; 6,040,863; and 6,160,849 (patents referred to in the

9   original complaint as "MPEG -2 Essential Patents") owned by Sony Corporation (one of the

10  "Licensors" in the original complaint) and administered and licensed by MPEG LA, as well as for

11  breach of contract.

12                                          **ARGUMENTS**

13          MPEG LA has NO legitimate argument that the Amended Complaint arises under the

14  Declaratory Judgment Act, 28 U.S.C. §§ 2201-02 and the patent laws of the United States, Title 35,

15  U.S.C. § 1 et seq., or that this Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and

16  1338(a).  MedioStream's amendments render MPEG LA's entire motion to dismiss moot.  The

17  question presented in MPEG LA's motion is moot given MedioStream's amended Complaint because

18  the Court clearly has subject matter jurisdiction, and most of the alleged facts in the original

19  complaint remained unchanged, with the exception of additional facts MedioStream added.

20  MedioStream added allegations demonstrating this Court has declaratory judgment jurisdiction under

21  28 U.S.C. § 2201 because there is an actual controversy between Plaintiff MedioStream and the

22  named Defendants MPEG LA and Sony regarding the non-infringement, invalidity, and

23  unenforceability of Sony's patents administered by MPEG LA.

24          MedioStream alleges in the Amended Complaint personal jurisdiction of this Court over

25  defendant MPEG LA in this case is proper because, on information and belief, MPEGLA, through

26  various commercial arrangements has engaged in continuous and systematic activities within the State

27  of California by *inter alia*, entering into negotiations to license intellectual property portfolios for

28  encoding and compression technologies, among others, for products within the stream of commerce

1   located within the State of California, and on further information and belief MPEG LA has signed

2   license agreements with companies and individuals located within the State of California, including

3   this district, with the knowledge and/or understanding that such activities would be enforced in the

4   State of California, including this district.  MPEG LA has not disputed personal jurisdiction.

5       MedioStream further alleged in the Amended Complaint personal jurisdiction of this Court

6   over defendant Sony Corporation in this case is proper because, on information and belief, Sony

7   Corporation, through various commercial arrangements has engaged in continuous and systematic

8   activities within the State of California by *inter alia*, entering into negotiations to license intellectual

9   property portfolios for encoding and compression technologies, among others, for products within the

10  stream of commerce located within the State of California, and Sony Corporation has signed license

11  agreements MedioStream and, on information and belief, with companies and individuals located

12  within the State of California, including this district, with the knowledge and/or understanding that

13  such activities would be enforced in the State of California, including this district.  Further, on

14  information and belief, Sony Corporation has brought patent infringement suits against alleged

15  infringers within the State of California, including this district.

16      Finally, MedioStream alleges in the Amended Complaint personal jurisdiction of this Court

17  over defendant Sony Corporation of America in this case is proper because, on information and

18  belief, Sony Corporation of America, through various commercial arrangements has engaged in

19  continuous and systematic activities within the State of California by *inter alia*, entering into

20  negotiations to license intellectual property portfolios for encoding and compression technologies,

21  among others, for products within the stream of commerce located within the State of California, and

22  on information and belief Sony Corporation of America has signed license agreements with

23  companies and individuals located within the State of California, including this district, with the

24  knowledge and/or understanding that such activities would be enforced in the State of California,

25  including this district.  Further, on information and belief, Sony Corporation has brought patent

26  infringement suits against alleged infringers within the State of California, including this district.

27      Rule 15(a)(2) of the Federal Rules of Civil Procedure covers amended pleadings and provides

28  in part that "a party may amend the party's pleading once as a matter of course at any time before a

1   responsive pleading is served…[o]therwise a party may amend the party's pleading only by leave of

2   court or by written consent of the adverse party." Fed. R. Civ. P. 15(a). Where leave of the court is

3   sought, Rule 15 states, "[L]eave shall be freely given when justice so requires." *Id.* In *Foman v. Davis*,

4   the Supreme Court held that [i]n the absence of any apparent or declared reason – such as undue

5   delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by

6   amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the

7   amendment, futility of amendment, etc. – the leave sought should, as the rules require, be "freely

8   given." *Foman v. Davis*, 371 U.S. 178, 182 (1962). In *Advanced Cardiovascular Sys., Inc. v. SciMed*

9   *Life Sys., Inc.*, the Court stated that "the court must be very liberal in granting leave to amend a

10  complaint," noting that "[t]his rule reflects an underlying policy that disputes should be determined on

11  their merits, and not on the technicalities of pleading rules." *Advanced Cardiovascular Sys., Inc. v.*

12  *SciMed Life Sys., Inc.*, 989 F.Supp. 1237, 1241 (N.D. Cal. 1997).

13      The only delay in this case has been the result of reassignments, and plaintiff has stipulated to

14  several requests to extend dates requested by MPEG LA.  Given MPEG LA simply barrowed its

15  motion from a prior case, and this case is still in its very early stages, MPEG LA can not show any

16  prejudice from th filing of MedioStream's amended Complaint.  MedioStream respectfully requests

17  that MPEG LA's motion to dismiss be denied, and that the Court enter and order filing

18  MedioStream's Amended Complaint.

19  Dated:  August 29, 2011                                    Respectfully submitted,

20

21                                                      By:   /s/ Byron Cooper
                                                            Byron Cooper (State Bar No. 166578)
22                                                          530 Lytton Avenue, Suite 200
                                                            Palo Alto, California  94301
23                                                          Telephone: (650) 283-4244
                                                            Facsimile: (650) 617-3201
24                                                          Email: bcooper@teklaw.co

25                                                          Attorneys for Plaintiff
                                                            MEDIOSTREAM, INC.

26

27

28

# EXHIBIT 1

1   Byron Cooper (State Bar No. 166578)
2   530 Lytton Avenue, Suite 200
    Palo Alto, California  94301
3   Telephone: (650) 283-4244
    Facsimile: (650) 617-3201
4   Email: bcooper@teklaw.co

5   Attorneys for Plaintiff
    MEDIOSTREAM, INC.
6

7               UNITED STATES DISTRICT COURT
8           FOR THE NORTHERN DISTRICT OF CALIFORNIA
9                    SAN JOSE DIVISION
10

11  MEDIOSTREAM, INC.,                    Case No. 10-CV-05979 EJD

12                  Plaintiff,            **AMENDED COMPLAINT FOR**

13          v.                            **DECLARATORY RELIEF and**

14                                        **BREACH OF CONTRACT**
15  MPEG.LA, L.L.C., SONY CORPORATION,
    and SONY CORPORATION OF AMERICA
16                  Defendants.           **DEMAND FOR JURY TRIAL**

17

18

19

20          Plaintiff MEDIOSTREAM, INC. for its Complaint against Defendants MPEG LA, L.L.C.

21  ("MPEG LA"), SONY CORPORATION, and SONY CORPORATION OF AMERICA (the Sony

22  entities are referred herein collectively as "Sony"),  alleges:

23                      **NATURE OF THE ACTION**

24          1.      This is an action for a declaratory judgment of non-infringement, invalidity, and

25  unenforceability of U.S. Patent numbers Re 37,222; 5,191,436; 5,291,486; 5,298,991; 5,343,248;

26  5,428,396; 5,461,420; 5,481,553; 5,510,840; 5,539,466; 5,543,847; 5,559,557; 5,663,763; 5,666,461;

27

28

5,701,164; 5,946,042; 5,982,437; 6,040,863; and 6,160,849 owned by Sony and administered and licensed by MPEG LA, and for breach of contract.

## THE PARTIES

2.      Plaintiff MedioStream, Inc. ("MedioStream") is a California corporation that maintains its principal place of business at 4962 El Camino Real, Suite 120, Los Altos, CA 9402.

3.      Upon information and belief, defendant MPEG LA, L.L.C. ("MPEG LA") is a limited liability company of Delaware having its principal place of business at 6312 S Fiddlers Green Circle, Suite 400E, Greenwood Village, Colorado.

4.      Upon information and belief, defendant Sony Corporation is a corporation of Japan with its principal place of business at 1-7-1 Konan Minato-ku, Tokyo, 108-0075, Japan.

5.      Upon information and belief, defendant Sony Corporation of America, is a Delaware corporation with its principal place of business at 550 Madison Avenue, New York, NY.  Upon information and belief, at all relevant times herein defendants Sony Corporation and Sony Corporation of America shared the same Chief Executive Officer and General Counsel, with both officers having thier principal office at the headquarters of Sony Corporation of America, located at 550 Madison Avenue, New York, NY.  Sony Corporation of America is Sony Corporation's "general manager" under California common law. *Yamaha Motor Company, Ltd. v. Superior Court*, 174 Cal.App.4th 264 (2009) [citing *Cosper v. Smith & Wesson Arms Co.* 53 Cal.2d 77, 346 P.2d 409 (1959); *Volkswagenwerk Aktiengesellschaft v. Schlunk*, 486 U.S. 694 (1988)].  Sony Corporation of America and Sony Corporation are collectively referred to herein as "Sony."

## JURISDICTION AND VENUE

6.      This action arises under the Declaratory Judgment Act, 28 U.S.C. §§ 2201-02 and the patent laws of the United States, Title 35, U.S.C. § 1 et seq. This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1338(a).

7.      This Court has declaratory judgment jurisdiction under 28 U.S.C. § 2201 because, as shown below, there is an actual controversy between Plaintiff MedioStream and Defendants MPEG LA and Sony regarding the non-infringement, invalidity, and unenforceability of Sony's patents administered by MPEG LA.

8.     The personal jurisdiction of this Court over defendant MPEG LA in this case is proper because, on information and belief, MPEGLA, through various commercial arrangements has engaged in continuous and systematic activities within the State of California by *inter alia*, entering into negotiations to license intellectual property portfolios for encoding and compression technologies, among others, for products within the stream of commerce located within the State of California, and on further information and belief MPEG LA has signed license agreements with companies and individuals located within the State of California, including this district, with the knowledge and/or understanding that such activities would be enforced in the State of California, including this district.

9.     The personal jurisdiction of this Court over defendant Sony Corporation in this case is proper because, on information and belief, Sony Corporation, through various commercial arrangements has engaged in continuous and systematic activities within the State of California by *inter alia*, entering into negotiations to license intellectual property portfolios for encoding and compression technologies, among others, for products within the stream of commerce located within the State of California, and Sony Corporation has signed license agreements MedioStream and, on information and belief, with companies and individuals located within the State of California, including this district, with the knowledge and/or understanding that such activities would be enforced in the State of California, including this district.  Further, on information and belief, Sony Corporation has brought patent infringement suits against alleged infringers within the State of California, including this district.

10.     The personal jurisdiction of this Court over defendant Sony Corporation of America in this case is proper because, on information and belief, Sony Corporation of America, through various commercial arrangements has engaged in continuous and systematic activities within the State of California by *inter alia*, entering into negotiations to license intellectual property portfolios for encoding and compression technologies, among others, for products within the stream of commerce located within the State of California, and on information and belief Sony Corporation of America has signed license agreements with companies and individuals located within the State of California, including this district, with the knowledge and/or understanding that such activities would be enforced in the State of California, including this district.  Further, on information and belief, Sony Corporation

has brought patent infringement suits against alleged infringers within the State of California, including this district.

11. Venue is proper in this Court under 28 U.S.C. §§ 1391(b) and (c) and 1400(b).

**BACKGROUND FACTS**

12. Plaintiff MedioStream (originally named Medio Systems) was formed in 1998 by a programmer who wrote special microprocessor instructions to speed up digital video processing, one of the most taxing operations on a computer's processor. A year later, during the 1999 Las Vegas Consumer Electronics Show, Plaintiff's first product was featured on the front page of the EE Times because it made recording video (MPEG-2 at standard resolution) in real-time on a Windows-based computer possible using only its software encoder. Plaintiff began planning a consumer software video product to record digital video on the personal computer in real-time, something previously done only by professionals using very expensive computers.

13. In early September 2000, Plaintiff hired John Huang (the inventor of its issued patents and designer of the first professional DVD video disk authoring application for Windows-based computers) to design an application for consumers using Plaintiff's unique technology. Mr. Huang was very impressed with Plaintiff's core innovative technology and immediately conceived an inventive software application that would take advantage of this technology as well as his knowledge and expertise in the video processing and disk authoring field. Examples of Plaintiff's early core technology are found in its early patent applications. The result was a video product that was faster, more efficient, and required fewer computer resources to run than anything on the consumer market in September 2000. Mr. Huang's combination of professional video expertise and knowledge of the video market gave him a unique perspective when combined with Plaintiff's advanced technologies. Many who saw MedioStream's plans for a consumer video product under non-disclosure agreements sought to copy it. After reducing the invention to practice in late 2001, Plaintiff filed patent applications in July 2002 to protect Mr. Huang's inventions, as it had done with numerous other technology innovations since 1999.

14. Plaintiff's neoDVDstand software is an integrated computer software application that combined video format conversion and disk authoring, allowing any user to record video on a DVD or

CD disk that would play on any consumer's DVD player connected to a TV.  Plaintiff's integrated software made video processing and disk authoring so simple that only a few inputs, e.g., the media format the consumer wanted to record (e.g. DVD or VCD) and the television standard where the recorded disk media would be played, were needed to create a video disk on nearly any basic personal computer system.  Plaintiff's consumer software application was built using Plaintiff's video and sound processing technology developed by Plaintiff to allow personal computers to achieve what could previously only be achieved on very high end expensive computers.  Plaintiff developed an application programmer interface (API) for running on any Windows based computer to execute software and perform media processing of sound and video desired by its software.

15.     Early attempts at software-only video encoding applications for personal computers were very slow and often overwhelmed the computer's processor.  Software for real-time video capture, video format conversion and disk authoring required significant hard disk storage for very large temporary files while the video was being processed because most software encoders could not process video in real time.  Additionally, video capture, video format conversion and disk authoring usually required several programs and additional disk storage for partially processed video files within the video encoding software and for video files in-between applications.  In order to speed up processing, significant hardware upgrades were required such as dedicated (hardware) video processors for encoding and hard disk drives with increased speed, capacity and caching capabilities, not usually available on standard consumer computers.  Video format conversion and disk authoring required significant investments in expensive software (multiple programs for video format conversion, editing and disk authoring) and hardware (dedicated video processor and/or hard disk drive upgrades).

16.     Plaintiff's neoDVDstandard 1.0 product was launched in July of 2001.  Plaintiff was a small start-up with limited resources, and despite its diligent efforts could not complete its full product design with all of the planned features until nearly the end of 2001 when Plaintiff launched neoDVDstandard 2.0, a consumer video product that achieved substantial success.  Plaintiff's neoDVD video products were so innovative that they were featured in stories by television news broadcasts around the country between October and December 2001.  Mr. Huang's invention took the

1    work and expertise, as well as much of the cost, out of recording a DVD or VCD disk for playback on

2    the DVD players used by millions of consumers.  After the invention, anyone could record video on a

3    DVD or CD disk that would play on their DVD player connected to a TV.  Plaintiff's software made

4    video processing and disk authoring so simple that only a few inputs were needed to create a video

5    disk on nearly any basic personal computer system.  In 2000 a DVD burner cost well over $1000 and

6    2001 the price fell to about $500, therefore most computers for the average consumer did not have a

7    DVD burner because these devices were prohibitively expensive.  Mr. Huang designed a product

8    capable of recording video on a CD that could be played back on everyone's DVD player, with

9    millions already attached to televisions in the US.

10           17.    Video on a CD, called Video CD (or VCD) after the standard created for the

11   recordings, is similar to DVD video, but has lower resolution and other qualities.  The VCD standard,

12   however, was not well known or used much in the US, but was well known and used in overseas

13   markets.  Mr. Huang understood most DVD players were designed to play a Video CD compliant CD

14   disk, so he designed his consumer video recording software with the capability to author video using

15   the CD burner already on most consumers' computer.  However, those who upgrade or bought

16   computer systems with a DVD burner could use the same software to make a higher resolution DVD.

17   The parameters required to record a VCD are not the same as the parameters for recording a DVD,

18   and understanding the difference required significant knowledge and skill.

19           18.    Mr. Huang's video product would make the appropriate technical decisions for the

20   consumer in selecting the appropriate video parameters and arranging them in the very precise manner

21   required to create a video disk that could be played on any DVD player connected to a TV.  The

22   software was so simple that it only two pieces of information - the media format the consumer

23   ultimately wanted to record (e.g. DVD or VCD) and the television standard where the recorded disk

24   media would be played or watched.  This was the minimum information required by the program

25   because the parameters for writing the video to disk differs in significant ways depending on the

26   television system (for example, NTSC in the US and PAL in Germany) and the media format (DVD or

27   VCD).

28

19.     The ability to create a standard DVD or VCD that could be played on DVD players connected to millions of televisions around the world would make a consumer's personal computer immediately useful in new ways.  For example, anyone who wanted to send videos to relatives or business associates anywhere in the world using existing digital recorders, cameras or any other sources of video, could now do so without expensive equipment and technical expertise. When Plaintiff's neoDVDstandard 2.0 product was launched, it brought the cost of a system for recording a video that could be played on any DVD player connected to any television from over $100,000 to under $1000, with software that cost under $100.

20.     By the time Plaintiff's first patent issued on March 7, 2006, Plaintiff had disclosed its consumer video plans to other companies under non-disclosure agreements in an effort to find partners for development.  Despite signing the non-disclosure agreements, many incorporated the patented features into their future products that flooded the market.  Before Plaintiff's technology was disclosed to Defendants, it was difficult for ordinary computer users to make a video disk using video from the internet or a video camera.  For example, digital video on a computer can be displayed in any size or frame rate, and often the parameters such as video size, frame rate, video compression, sound compression, among others are unknown to the consumer.  Preparing video with unknown properties for recording on disk media for playback on standard devices such as a DVD player connected to a TV required knowledge and expertise of video standards for disk media, compression standards, and TV standards, among other things.

21.     Although a user may know s/he wants to make a DVD video (not a VCD or SVCD), and the DVD video will be displayed in the US (using the NTSC standard), processing the video information using the correct parameters into the required format for writing to disk media required knowledge and expertise in many areas, in addition to sophisticated expensive equipment running multiple program applications.  One seeking to record video on disk media required knowledge concerning the parameters for each output media format as well as which of the required parameters would work on a TV using a particular TV standard.  The skills and knowledge needed to convert video information into the required presentation format before the invention was very high because

1    doing so often required selection and use of several programs for converting, editing and disk

2    authoring, and many of these software applications were complex and their outputs incompatible.

3          22.    MedioStream and Sony began discussing MedioStream's technology in confidence

4    under a non-disclosure agreement in 2001.  Shortly thereafter, on January 1, 2002, Sony licensed

5    MedioStream's products that embodied the technology claimed in MedioStream's patents, and

6    included not only a license to Sony, but also all of its subsidiaries.  After including MedioStream's

7    technology in its products for several years under the agreement, Sony did not renew the agreement

8    with MedioStream, and when it expired Sony continued using MedioStream's technology.

9          23.    Defendant MPEG LA is the "Licensing Administrator" for numerous Licensors

10   (including defendant Sony) that own and have the right to license one or more patents that are

11   allegedly necessary for compliance with the MPEG-2 Standard (referred to as "MPEG-2 Essential

12   Patents").  MPEG LA and the Licensors negotiated with the US Department of Justice (DOJ) for the

13   right to pool and license the MPEG-2 Essential Patents under terms the DOJ believed would not

14   violate US antitrust laws.  The DOJ issued a letter to MPEG LA and Licensors accordingly.  The

15   Licensors signed an ISO undertaking or otherwise committed to make available licenses and/or

16   sublicenses under any and all MPEG-2 Essential Patents licensable or sub licensable by the Licensor

17   to any individual, company or other entity desiring such a license and/or sublicense on fair, reasonable

18   and nondiscriminatory terms and conditions.  On January 1, 2002 MedioStream entered into a MPEG-

19   2 Patent Portfolio License agreement with defendant MPEG LA as the authorized Licensing

20   Administrator for all MPEG-2 Essential Patents, including patents owned by defendant Sony.

21         24.    MedioStream filed numerous patent applications to protect its technology since its

22   formation in 1998.  After MedioStream's first patent issued in 2006, MedioStream filed a patent

23   infringement case against Sony and other defendants for violating its patent rights.  Defendant Sony

24   contacted MedioStream and threatened to file counterclaims for infringement of its numerous patents,

25   including patents licensed to MedioStream by defendant MPEG LA, unless MedioStream withdrew its

26   lawsuit against Sony.

27         25.    Pursuant to the terms of the license agreement with MPEG LA, plaintiff MedioStream

28   offered a license to Sony as required by the terms of its MPEG-2 Patent Portfolio License agreement

with MPEG LA, and set a date certain for its offer of a license to expire.  Sony failed to accept MecdioStream's offer of a license, therefore by the terms of the MPEG-2 Patent Portfolio License agreement, Sony lost any right to seek termination of the MPEG-2 Patent Portfolio License agreement or to bring suit against MedioStream for violating its patents licensed under the MPEG-2 Patent Portfolio License agreement as long as the MPEG-2 Patent Portfolio License agreement was in full force and effect.

26.     MedioStream's MPEG-2 license agreement was set to expire on December 31, 2010, however the agreement includes the right to renew the agreement for additional five year periods until the last of the MPEG-2 Essential Patents expires.  On December 20, 2010 MedioStream exercised its right to renew the license agreement by providing notice of its renewal to MPEG LA.  MedioStream's right to renew the agreement is found in Section 6.1 of the MPEG-2 Patent Portfolio License, and provides in relevant part:

> This Agreement shall expire on December 31, 2010.  Upon expiration, Licensee shall have the right to renew this sublicense for successive five year periods for the life of any MPEG-2 Patent Portfolio Patent, subject to reasonable amendment of the royalty terms and rates set forth in this sublicense.  Such reasonable amendment may take into account prevailing market conditions, changes in technological environment, and available commercial products at the time of each five year renewal.

27.     MedioStream did not propose any amendments to the agreement.  MPEG LA has sent two proposed amended agreements to MedioStream that amend nearly every clause of the original agreement, substantially changing the terms of the original license agreement.  Further, MPEG LA has refused to acknowledge or otherwise allow MedioStream to renew of the original agreement.  Instead, MPEGLA insists that MedioStream fore-go its right to renew the original agreement thereby refusing to honor the terms of the original agreement.  MPEG LA has intentionally breached the existing agreement by refusing to honor the renewal clause.  All the amended draft agreements provided to MedioStream by MPEG LA eliminate the provisions whereby MedioStream may continue its patent suit against any Licensor (including MedioStream's current litigation against Sony) upon offering a license.

28.     MedioStream's products rely on MPEG-2 technology and MedioStream has invested significant sums to research, develop and market its products.  Those products include MedioStream's innovative patented technology, and MedioStream has relied on its MPEG-2 license with MPEGLA,

1  and specifically the right to renew that license until the last of the MPEG-2 Essential Patents expires,

2  in investing in its business to develop and market its products.  MedioStream has billions of dollars at

3  stake in current litigation regarding its rights to make its own products to the exclusion of others, who

4  have intentionally copied MedioStream's technology in deliberate efforts to put MedioStream out of

5  business, including Licensors under the license agreement at issue.

6        29.    MedioStream has fulfilled all its obligations under the existing license agreement, and

7  has provided MPEG LA proper notice regarding its renewal of the existing agreement.  MPEG LA has

8  not notified MedioStream of any breaches of the agreement.  MPEG LA simply refuses to renew the

9  existing agreement as required under its terms.  Instead, MPEGLA has taken the position that it does

10  not wish to honor the original agreement regarding MedioStream's renewal rights in breach of the

11  agreement.  As a result, MedioStream has a reasonable apprehension that Sony and other Licensors

12  under the MPEG-2 Patent Portfolio License agreement will bring suit against MedioStream for patent

13  infringement where MedioStream has sued to enforce its patents, including the ongoing litigation

14  between MedioStream and defendant Sony.

15        30.    More specifically, MPEG LA and its Licensors (including defendant Sony) seeks to

16  force MedioStream (and numerous other parties who have licensed the MPEG-2 Essential Patents

17  under terns approved by the DOJ) to accept an agreement where material provisions are changed to

18  MedioStream's determent in its ongoing litigation against defendant Sony.  For example, MPEG LA's

19  seeks to change definitions for the terms "affiliate," "MPEG-2 Essential Patent," "MPEG-2 Related

20  Patent," and "MPEG-2 Standard" that are material and essential clauses in the agreement, but

21  unrelated to "royalty terms and rates" that may be changed under the agreement.  Many of MPEG

22  LA's alleged "required" changes relate directly to MedioStream's ongoing litigation, including

23  changes to sub-section 6.3 titled "Partial Termination in the Event of Litigation."  Other examples

24  include the definition of "Licensed Product" that is deleted prom MPEG LA's "required" new license

25  even though this term defines what products the license covers.

26        31.    MPEG LA has informed MedioStream that any license going forward must include

27  new sub-sections not in the original agreement that materially changes substantial rights of the parties

28  and provide new rights to MPEG LA that it did not have under the original agreement.  More

specifically, MPEG LA requires new sub-sections 2.7; 4.6; 4.8; 4.13; 6.5.4; 6.5.5; 6.5.6; and 6.5.7 in the only agreement it claims to be able to offer, but all these sub-sections significantly modify and changes the rights of the parties.

32.     Sub-section 6.1 that gives MedioStream the right to renew the agreement is deleted altogether in one proposed alternative agreement provided by MPEG LA.  In the only other alternative provided by MPEG LA sub-section 6.3 is materially changed, and a new sub-section 6.3.1 is added - changing significantly the rights of the parties.  Additionally, MPEG LA refuses to renew the agreement unless a new sub-section 7.1.2 is added that completely changes a provision in the original agreement regarding assignment rights.  Additionally, MPEG LA refuses to renew the agreement without a revised sub-section 7.18 that adds a venue provision not in the original agreement.

33.     After negotiating for the ability to pool all essential MPEG-2 patents for the purpose of licensing them with the DOJ, MPEG LA and its Licensors (including defendant Sony) have become the world's largest supplier of licenses for video compression, and they possess monopoly power in the market for video compression. MPEG-2 video compression is used in nearly every DVD player, television and personal computer (PC) in the United States. Nearly all new TVs, DVD recorders and players, and PCs are licensed under the MPEG-2 Patent Portfolio License. TV manufacturers, DVD recorder and player manufacturers, and PC manufacturers (often referred to as Original Equipment Manufacturers or "OEMs") have no commercially reasonable alternative to MPEG LA's video compression for the TVs, DVD recorders/players, and PCs that they distribute.

34.     There are high barriers to entry in the market for TV, DVD recorder/player, and PC video compression. One of the most important barriers to entry is the barrier created by the number of that must use a video compression technique in order to make it attractive to end users. Because end users want a large number of devices available to play or record video using a compression standard, and because most devices today use MPEG-2 video compression, and because it would be prohibitively difficult, time-consuming, and expensive to create an alternative video compression that did not use MPEG-2 as well, a potential new video compression entrant faces a high barrier to successful entry.

35.     Accordingly, the most significant potential threat to MPEG LA's video compression monopoly is from a direct frontal assault by a new video compression standard that would become an alternative "platform" which devices can use, and which can be used in conjunction with multiple video compression standards, including but not limited to MPEG-2.

36.     To protect its valuable MPEG-2 monopoly against such potential competitive threats, and to extend its video compression monopoly into other video processing markets, MPEG LA and its Licensors (including Sony) have engaged in a series of anti competitive activities.  MPEG LA's conduct includes amending its agreements tying the licensing of other's technology to MPEG LA's MPEG-2 video compression; exclusionary agreements precluding companies from enforcing their intellectual property rights; and exclusionary agreements restricting the right of companies to provide services or resources to MPEG LA's competitors or potential competitors.

37.     One important threat to MPEG LA's MPEG-2 video compression monopoly comes from other standards based video compression on the user's TV, DVD recorder/player, and PC.  After MedioStream demonstrated its software for processing media by converting one stand to another, MPEG LA and Sony recognized the importance of such media processing software and sought to require all users of MPEG-2 video compression to cross license all of their intellectual property, including any video compression used on all TVs, DVD recorders/players, and PCs.  Specifically, MPEG LA Sony sought to require all users of TVs, DVD recorders/players, and PCs with its MPEG-2 video compression to license MPEG LA and all its Licensors to any other video compression in order to protect its TV, DVD recorder/player, and PC video compression monopoly from competitive threats, and use its monopoly power to expand into new video markets using other video compression.

38.     Making MPEG-2 video compression the exclusive video compression on TVs, DVD recorders/players, and PCs was the most importance goal at MPEG LA.    To protect its valuable MPEG-2 monopoly against potential competitive threats, and to extend its video compression monopoly into other licensing markets, MPEG LA has engaged in a series of anti competitive activities. MPEG LA's conduct includes agreements tying other intellectual licenses to MPEG LA's MPEG-2 video compression and exclusionary agreements restricting the right of companies to enforce

their intellectual property against  MPEG LA's Licensors, including Sony, in violation of the

agreement MPEG LA and the LICENSORS reached with DOJ.

**COUNT 1**
**FIRST CLAIM FOR RELIEF**
**Declaration of Enforceability of License Agreement**
**(AGAINST ALL DEFENDANTS)**

39.     Plaintiff MedioStream restates and incorporates by reference each of the allegations

of paragraphs 1-21 of the complaint above, as if fully set forth herein.

40.     Based on MPEG LA's refusal to acknowledge MedioStream's renewal of the original

agreement sent December 20, 2010, as well as MPEG LA's repeated refusal to sign any document

acknowledging MedioStream's renewal except two draft agreement that materially and substantially

change the parties rights and obligations, an actual controversy has arisen and now exists between

the parties as to whether MedioStream has properly renewed the license agreement and what terms

must be included in the renewed license agreement.

41.     Pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. § 2201 et seq., Plaintiff

MedioStream requests a declaration from the Court that its products remain licensed under the

MPEG-2 Patent Portfolio License agreement.

**COUNT 2**
**SECOND CLAIM FOR RELIEF**
**Breach of License Agreement**
**(AGAINST ALL DEFENDANTS)**

42.     Plaintiff MedioStream restates and incorporates by reference each of the allegations

of paragraphs 1-24 of the complaint above, as if fully set forth herein.

43.     Plaintiff MedioStream entered into the MPEG-2 Patent Portfolio License agreement

with MPEG LA on January 1, 2002.

44.     The MPEG-2 Patent Portfolio License agreement includes an adequate exchange of

consideration and is valid and binding in all respects.

45.     MedioStream has fully performed all of its obligations under the MPEG-2 Patent Portfolio License agreement.

46.     Defendant MPEG LA has breached the MPEG-2 Patent Portfolio License agreement by, *inter alia*, refusing to renew and refusing to acknowledge MedioStream's renewal of the agreement.  Defendant MPEG LA has breached the MPEG-2 Patent Portfolio License agreement by refusing to renew the agreement unless significant material amendments are accepted by MedioStream, even though the amendments are not reasonable and are not amendments of "the royalty terms and rates" set forth in the agreement.

47.     Defendant MPEG LA breached the MPEG-2 Patent Portfolio License agreement, *inter alia*, by continuing to refuse to accept MedioStream's renewal of the agreement and by refusing to accept any other performance by MedioStream under the agreement.

48.     As a direct and proximate result of the conduct alleged herein, MedioStream has suffered and will continue to suffer damages in amount to be proven at trial.

**COUNT 3**
**THIRD CLAIM FOR RELIEF**
<u>**Declaration of Non-Infringement, Invalidity, and Unebforceability**</u>
<u>**(AGAINST ALL DEFENDANTS)**</u>

49.     Plaintiff MedioStream restates and incorporates by reference each of the allegations of paragraphs 1-48 of the complaint above, as if fully set forth herein.

50.     MedioStream does not and has not directly infringed, contributed to the infringement of, nor actively induced others to infringe any valid and enforceable claim of U.S. Patent numbers Re  37,222;  5,191,436;  5,291,486;  5,298,991;  5,343,248;  5,428,396;  5,461,420;  5,481,553; 5,510,840; 5,539,466; 5,543,847; 5,559,557; 5,663,763; 5,666,461; 5,701,164; 5,946,042; 5,982,437; 6,040,863; and 6,160,849.

51.     At least one claim of each of U.S. Patent numbers Re 37,222; 5,191,436; 5,291,486; 5,298,991; 5,343,248; 5,428,396; 5,461,420; 5,481,553; 5,510,840; 5,539,466; 5,543,847; 5,559,557; 5,663,763; 5,666,461; 5,701,164; 5,946,042; 5,982,437; 6,040,863; and 6,160,849 is invalid for failure to comply with one or more of the conditions and requirements of the patent laws, including, but not limited to, 35 U.S.C. §§ 101, 102, 103 and 112, and the rules, regulations and laws pertaining to those provisions.

52.     U.S. Patent numbers Re 37,222; 5,191,436; 5,291,486; 5,298,991; 5,343,248; 5,428,396; 5,461,420; 5,481,553; 5,510,840; 5,539,466; 5,543,847; 5,559,557; 5,663,763; 5,666,461; 5,701,164; 5,946,042; 5,982,437; 6,040,863; and 6,160,849 are unenforceable due to MPEG LA and Sony's antitrust violations in connection with the licensing and/or enforcement of said patents.

### PRAYER FOR RELIEF

53.     WHEREFORE, Plaintiff MedioStream, Inc. requests entry of judgment in its favor and against Defendants as follows:

1. A temporary and permanent injunction against Defendant MPEG LA and its respective officers, agents, employees, and those acting in privity with them, from further breaches of the MPEG-2 Patent Portfolio License agreement;

2. A declaration that the MPEG-2 Patent Portfolio License agreement is valid and enforceable by MedioStream, and the agreement was effectively renewed by MedioStream for an additional five year period by MedioStream's notice of its renewal to MPEG LA on December 20, 2010 and thereafter, and that MedioStream's licensed products have remained continuously licensed under the agreement; and

3. That the Court enter judgment:

    a. Declaring that Plaintiff does not infringe and has not infringed any claim of U.S. Patent numbers Re 37,222; 5,191,436; 5,291,486; 5,298,991; 5,343,248; 5,428,396; 5,461,420; 5,481,553; 5,510,840; 5,539,466; 5,543,847; 5,559,557; 5,663,763; 5,666,461; 5,701,164; 5,946,042; 5,982,437; 6,040,863; and 6,160,849, either directly or indirectly;

1          b.  Declaring that the claims of U.S. Patent numbers Re 37,222; 5,191,436;

2               5,291,486; 5,298,991; 5,343,248; 5,428,396; 5,461,420; 5,481,553; 5,510,840;

3               5,539,466; 5,543,847; 5,559,557; 5,663,763; 5,666,461; 5,701,164; 5,946,042;

4               5,982,437; 6,040,863; and 6,160,849 are invalid;

5          c.  Declaring that U.S. Patent numbers Re 37,222; 5,191,436; 5,291,486;

6               5,298,991; 5,343,248; 5,428,396; 5,461,420; 5,481,553; 5,510,840; 5,539,466;

7               5,543,847; 5,559,557; 5,663,763; 5,666,461; 5,701,164; 5,946,042; 5,982,437;

8               6,040,863; and 6,160,849 are unenforceable;

9          d.  Finding that, pursuant to 35 U.S.C. § 285 and/or other applicable laws,

10              Defendant's conduct renders this an exceptional case and that Plaintiff be

11              awarded costs of this action and its attorneys' fees to the extent permitted by

12              law; and

13     4.  Such other and further relief as the Court deems just and proper.

14  Dated:  August 19, 2011                    Respectfully submitted,

15

16                                      By:   /s/ Byron Cooper
                                          Byron Cooper (State Bar No. 166578)
17                                        530 Lytton Avenue, Suite 200
                                          Palo Alto, California  94301
18                                        Telephone: (650) 283-4244
                                          Facsimile: (650) 617-3201
19                                        Email: bcooper@teklaw.co

20                                        Attorneys for Plaintiff
                                          MEDIOSTREAM, INC.

21

22

23

24

25

26

27

28

1

**JURY DEMAND**

2        Pursuant to Fed. R. Civ. P. 38(b), Plaintiff MedioStream hereby demands a trial by jury on all

3   issues triable of right by a jury.

4   Dated:  August 19, 2011                          Respectfully submitted,

5

6                                          By:   /s/ Byron Cooper
                                                Byron Cooper (State Bar No. 166578)
7                                               530 Lytton Avenue, Suite 200
                                                Palo Alto, California  94301
8                                               Telephone: (650) 283-4244
                                                Facsimile: (650) 617-3201
9                                               Email: bcooper@teklaw.co

10                                              Attorneys for Plaintiff
                                                MEDIOSTREAM, INC.
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28